*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 21-CV-0545

CHELSEA J. ANDREWS, APPELLANT,

v.

DISTRICT OF COLUMBIA HOUSING AUTHORITY, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-003465-B)

(Hon. Hiram Puig-Lugo, Motions Judge)

(Submitted June 2, 2022                              Decided June 6, 2024)

*Carla D. Brown* and *Peter C. Cohen* were on the brief for appellant.

*Yoora Pak* was on the brief for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and THOMPSON, *Senior Judge*.

BECKWITH, *Associate Judge*: At the beginning of the COVID-19 pandemic, Chelsea Andrews was fired from her job at the D.C. Housing Authority (DCHA). In a complaint, she alleged that her termination was retaliation for her efforts to blow the whistle about DCHA's decision to purchase counterfeit KN95 masks meant to protect workers entering public housing facilities. She brought claims under the

D.C. Whistleblower Protection Act (DCWPA) as well as tort and contract claims.

We reverse the trial court's denial of Ms. Andrews's motion to amend her complaint because the trial judge failed to apply the relevant standard for a motion to amend. We also reverse the court's grant of summary judgment to DCHA on Ms. Andrews's contract claims because the trial court did not address all of Ms. Andrews's arguments and more factual finding is in order. Finally, we affirm the grant of summary judgment to DCHA on Ms. Andrews's negligent supervision claim because she did not allege a common-law tort.

I.

According to her complaint, Ms. Andrews was serving as the deputy executive director and special counsel for the DCHA at the time of her termination. In this role, she reported directly to DCHA's executive director, Tyrone Garrett.[1] Although Mr. Garrett generally commended Ms. Andrews for her work, at various times he "push[ed] back" against her when she "provided her thoughts relating to personnel issues involving Mr. Garrett's personal friends," who worked alongside

---

[1] Though Mr. Garrett was named in the complaint, DCHA correctly states that he "is no longer a party to this litigation" because Ms. Andrews has not appealed the trial court's dismissal of the only claim (tortious interference) filed against him.

him at DCHA. According to Ms. Andrews's complaint, these friends included Mr. Garrett's college roommate and DCHA senior advisor, Bandele McQueen, and Mr. Garrett's friend and DCHA director of property management operations, Larry Williams. The disagreements between Ms. Andrews and Mr. Garrett came to a head during the COVID-19 pandemic.

To ensure that KN95 masks met U.S. standards, the National Institute for Occupational Safety and Health issued guidelines for detecting counterfeit masks that "may not be capable of providing appropriate respiratory protection to workers." Rather than purchase KN95 masks from one of the federally approved vendors, DCHA purchased masks from an acquaintance of Mr. McQueen's based on Mr. McQueen's referral. After Ms. Andrews and others raised concerns about the purchase, Mr. Williams provided what he alleged was a certification of authenticity of the masks, but the FDA later informed DCHA that no such certificate of authenticity existed.

Ms. Andrews questioned the procurement of the masks repeatedly, including when she "requested a photograph of the masks," spoke with Mr. Williams "so they could forge a path forward on the mask issue," and "proposed a set of Standard Operating Procedures" to govern any future mask orders. Mr. Garrett, Mr. Williams, and Mr. McQueen responded with hostility to Ms. Andrews and her

team when they questioned the "authenticity of the masks." Shortly after Ms. Andrews began raising concerns about the procurement of the masks, DCHA terminated her. The agency did not provide a reason for its decision.

Ms. Andrews filed a complaint against DCHA alleging, as relevant for this appeal, violations of the DCWPA, breach of contract, and negligent supervision and retention of an employee. At the time that Ms. Andrews filed her initial complaint, DCHA had not paid her the eight months' pay guaranteed in her contract. Specifically, Ms. Andrews's contract guaranteed her a sixty-day notice before termination, or in lieu of that notice, sixty days of wages, and a severance payment equaling six months of pay. She received the promised pay one month after she filed her initial complaint, more than three months after she was terminated.

The trial court dismissed Ms. Andrew's DCWPA claim, concluding that the facts alleged in her complaint did "not include any fact or allegation that could constitute Plaintiff making a protected disclosure." Instead, her complaint demonstrated "merely that she *intended* to make" protected disclosures. To the extent that she provided specific information about who she spoke to and what she said, "these facts lean more toward disagreement with managerial decisions," and such disagreements are not protected under the DCWPA. Ms. Andrews moved to file an amended complaint, which included more specific allegations about who she

spoke with and what she said about the allegedly counterfeit masks. The court denied Ms. Andrews's motion, as well as her subsequent motion for reconsideration, because the court's initial order dismissing the claim was "a judgment on the merits" that was, by default, a dismissal with prejudice.

After discovery on Ms. Andrews's remaining contract and tort claims, the court granted summary judgment to DCHA. The court determined that Ms. Andrews could not show any damages stemming from the delay in her wages and severance payment because "the contract is silent as to the time when a wages and severance payment may be made." It further stated that, because "[n]one of [Ms. Andrews's] assertions regarding what Defendant DCHA knew about Tyrone Garrett invoke one of the common law duties Defendant DCHA owed to" Ms. Andrews, DCHA did not breach any common-law duty to her and could not be held liable under a negligent supervision theory. Ms. Andrews appealed to this court.

II.

We begin with the trial court's denial of Ms. Andrews's motion to amend her complaint.[2] Under Superior Court Civil Rule 15(a)(3), a party can amend its pleading with the consent of the opposing party or by leave of court. This is not a restrictive standard. Indeed, our policy of favoring "resolution of disputes on the merits creates a 'virtual presumption' that leave to amend should be granted unless there are sound reasons for denying it." *Pannell v. District of Columbia*, 829 A.2d 474, 477 (D.C. 2003) (quoting *Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n*, 641 A.2d 495, 501 (D.C. 1994)).

Specifically, when deciding on a motion to amend, the court considers several factors: "(1) the number of requests to amend; (2) the length of time that the case has been pending; (3) the presence of bad faith or dilatory reasons for the request; (4) the merit of the proffered amended pleading; and (5) any prejudice to the non-moving party." *Id.* (quoting *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1174 (D.C. 1997)). We review a trial court's decision to grant or deny a motion to

---

[2] Because we conclude that the trial court erred in denying Ms. Andrews's motion to amend her complaint, we do not decide whether the court erred when it dismissed her initial complaint or when it denied her motion for reconsideration of the court's denial of her motion to amend.

amend for abuse of discretion, deferring to the court's decision where it "identified and addressed the factors required by our decisions." *U.S. Bank Tr. v. Omid Land Grp., LLC*, 279 A.3d 374, 381 (D.C. 2022). Where the court's decision, as a matter of law, is outside "the range of permissible alternatives . . . [w]e will find reversible error and sacrifice the advantages attendant upon committing a determination to the discretion of the trial court . . . to achieve a proper decision." *Johnson v. United States*, 398 A.2d 354, 365-66 (D.C. 1979).

Here, the trial court did not recite or apply the appropriate motion-to-amend standard. Instead, in its two-paragraph discussion of the issue, the court appeared to give dispositive weight to an out-of-context statement in an unpublished Superior Court decision by Judge Jason Park that a "dismissal pursuant to Rule 12(b)(6) is a resolution on the merits and is ordinarily prejudicial." *Andrews v. D.C. Hous. Auth.*, No. 2020-CA-3465-B, (D.C. Super. Ct. Feb. 3, 2021) (quoting *District of Columbia v. Precision Contracting Sols.*, No. 2019-CA-5047-B, (D.C. Super. Ct. Jun. 25, 2020)). According to the trial court, "[b]ecause there has already been a judgment on the merits as to Count I, [Ms. Andrews] may not amend her Complaint to add the proposed claim." But while Judge Park's opinion did contain the quoted language, it never suggested—and neither has this court—that dismissal with prejudice

somehow barred a motion to amend.[3]   Judge Park in fact went on to deny the plaintiff's motion to amend only after applying the five-factor test.  *Precision Cont. Sols.*, No. 2019-CA-5047-B at \*33-38 (D.C. Super. Ct. Jun. 25, 2020).

The conclusion that a plaintiff can never use a motion to amend to resuscitate a count that has been dismissed is contrary to the text of Rule 15, which sets out the standard for motions to amend in three circumstances: (1) amendments "as a matter of course," filed shortly after the initial pleading was served, (2) amendments made after "a pleading is dismissed or stricken with leave to amend," and (3) amendments made "[i]in all other cases."  D.C. Super. Ct. Civ. R. 15(a).

---

[3] Nor have we said that a plaintiff may move to amend a partially dismissed complaint only after having successfully moved to vacate the judgment pursuant to Rule 59 or Rule 60.  Instead, we have imposed such a requirement only "after final judgment" where there is "no existing complaint to amend."  *Gant v. Sixteenth St. Heights Dev. LLC*, No. 23-CV-281 (D.C. June 6, 2024); *see also id.* ("[A] court cannot permit an amendment" of a complaint in a case that has been tried to final judgment "unless the plaintiff first satisf[ies] Rule 59(e)'s more stringent standard for setting aside that judgment.") (quoting *Ciralsky v. Cent. Intel. Agency*, 355 F.3d 661, 673 (D.C. Cir. 2004)) (alterations in original); *Daulatzai v. Maryland*, 97 F.4th 166, 178 (4th Cir. 2024) ("a motion to amend a complaint filed after a final judgment has been entered cannot be considered until the judgment has been vacated"); *Bogus v. Davis*, No. 6:19-cv-278-Jdk-KNM, 2023 U.S. Dist. LEXIS 79914, \*3 (E.D. Tex. Feb. 2, 2023) ("[B]ecause Plaintiff seeks reconsideration of a partial order of dismissal rather than a final judgment, neither Federal Rule of Civil Procedure 59(e) nor Rule 60(b) appl[ies].") (citing *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014) (stating that Rule 60(b) is limited to relief from a "final" judgment or order and that interlocutory orders do not fall under that rule)).

As for the first two circumstances, the rule essentially states the time period in which a party may amend its pleadings. D.C. Super. Ct. Civ. R. 15(a)(1)-(2). Parties amending as a matter of course must file within twenty-one days after service of the complaint or twenty-one days after service of certain responsive pleading or motions. Parties amending after the court has dismissed their pleading with leave to amend must generally file within twenty-one days after the dismissal order. Meanwhile, the rule imposes a higher requirement for the third circumstance—a plaintiff may amend her "pleading only with the opposing party's written consent or the court's leave." D.C. Super. Ct. Civ. R. 15(a)(3). Even under this more restrictive regime, trial judges are directed to "freely give leave when justice so requires." *Id.* It is when considering this third circumstance that we have adopted the five-factor test. *See e.g.*, *Rayner v. Yale Steam Laundry Condo. Ass'n*, 289 A.3d 387, 401-02 (D.C. 2023); *U.S. Bank Trust*, 279 A.3d at 380-81.

In its brief, DCHA itself treats Ms. Andrews's motion to amend as falling under Rule 15(a)(3) and applies the five-factor test in evaluating the motion. And for good reason: the text of subsection (3)—applying to "all other cases"— straightforwardly includes all motions to amend that are not governed by the more lenient standards set out in subsections (1) and (2).

But rather than apply the five-factor test, the trial court considered, at most,

only one of the relevant factors when denying Ms. Andrews's motion to dismiss, and in doing so, it misapplied this court's precedent. The trial court observed that Ms. Andrews's motion to amend—filed fifteen days after the trial court granted DCHA's motion to dismiss—arrived only after the court had already reached "a judgment on the merits." DCHA similarly argues that the timing of Ms. Andrews's motion should be weighed against her because she "did not seek leave to amend until [five] months after filing her lawsuit and only after an adverse ruling had been issued against her."

But when considering the timing of a motion to amend, this court focuses primarily on whether discovery has already occurred and whether granting the motion would "require new or additional discovery." *Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1239 (D.C. 2005); *see also Harnett v. Washington Harbour Condo. Unit Owners' Ass'n*, 54 A.3d 1165, 1176 (D.C. 2012); *Pannell*, 829 A.2d at 477. And even when discovery has begun (and finished) that timing is often insufficient on its own to justify denying a motion to amend. *See, e.g.*, *Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 52-53 (D.C. 2008) (reversing trial court's denial of motion to amend filed four months after partial dismissal of complaint even though plaintiff "stated no reason for his delay in moving to amend" his complaint because the "delay was not protracted"). Even a "lengthy delay by itself will not usually provide sufficient ground for refusing to

allow an amendment." *Eagle Wine & Liquor Co. v. Silverberg Elec. Co.*, 402 A.2d 31, 35 (D.C. 1979). Because Ms. Andrews's "delay was not protracted" and because discovery had not begun on the DCWPA claim, the timing of her motion does not support denying her the chance to amend her complaint. *See Taylor*, 957 A.2d at 52-53.

The merits of Ms. Andrews's proffered amended complaint also justify allowing that amendment. At this early stage in the proceedings, we "must construe the complaint in the light most favorable to the plaintiff." *Miller-McGee v. Washington Hosp. Ctr.*, 920 A.2d 430, 435 (D.C. 2007) (quoting *Haymon v. Wilkerson*, 535 A.2d 880, 882 (D.C. 1987)). To state a claim for relief under the DCWPA, a plaintiff must allege that she was subjected to "prohibited personnel action"—like termination—because she made a "protected disclosure." D.C. Code §§ 1-615.52 to .53. Relevant here, a "protected disclosure" means:

> any disclosure of information, . . . made . . . by an employee to a supervisor or a public body that the employee reasonably believes evidences: . . . (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; . . . or (E) A substantial and specific danger to the public health and safety.

*Id.* § 1-615.52(a)(6). "[T]he belief must be both sincere and objectively reasonable." *Ishakwue v. District of Columbia*, 278 A.3d 696, 706 (D.C. 2022) (quoting *Ukwuani*

*v. District of Columbia*, 241 A.3d 529, 551 (D.C. 2020)). A belief is "reasonable" if "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence" abuse of authority or a danger to public safety. *Id*. (quoting *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003)).

Ms. Andrews's amended complaint specifically alleges that after she learned that the KN95 masks were ordered from an acquaintance of Mr. McQueen rather than a federally approved provider, and after receiving notice that the certification of authenticity was not reliable, she called Mr. Garrett and informed him of her concern. This statement to her immediate supervisor was a protected disclosure in at least two respects. First, it describes a possible abuse of authority by a government official. "Abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that . . . results in personal gain or advantage to himself or to preferred other persons." *District of Columbia v. Poindexter*, 104 A.3d 848, 857 (D.C. 2014) (quoting *Embree v. Dep't of Treasury*, 70 M.S.P.R. 79, 85 (1996)). Ms. Andrews's amended complaint adequately alleges that she reported her belief that Mr. McQueen—rather than purchasing KN95 masks from an authorized vendor—had directed DCHA to spend government funds to purchase masks from a personal acquaintance.

Second, her statements alleged a "substantial and specific danger to the public health and safety." *See* D.C. Code § 1-615.52(a)(6)(E). According to her complaint, at the beginning of a deadly pandemic caused by an airborne virus, DCHA was purchasing counterfeit KN95 masks to provide to employees who were entering public housing. As she alleged in her complaint, "[d]efective or counterfeit masks would endanger the lives of the DCHA staff using the masks, as well as the residents, employees, families, and building tenants with whom the mask-wearing staff would interact."

Properly considered, the merits prong of the motion-to-amend standard supports granting Ms. Andrew's motion because her amended complaint "can be said to state a claim if all reasonable inferences are drawn in [her] favor." *Miller-McGee*, 920 A.2d at 435 (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)).

The remaining factors likewise support granting her motion to amend. It was her first and only motion to amend, and nothing about it suggests that she was acting in bad faith or that allowing her to amend her complaint would prejudice DCHA. "This is not a case in which the plaintiff failed to state a cognizable claim despite successive amendments, such that leave to amend might have encouraged, or appeared to sanction, efforts to delay an inevitable dismissal." *Id.* at 436 (internal

cross-reference omitted).

Because the trial court's denial of Ms. Andrews's motion to amend was not "predicated on some valid ground," *Edwards v. Safeway, Inc.*, 216 A.3d 17, 19 (D.C. 2019) (quoting *Eagle Wine & Liquor Co.*, 402 A.2d at 34), the court's ruling was an abuse of discretion warranting reversal.

III.

We now turn to the trial court's grant of summary judgment to DCHA on Ms. Andrew's contract claims. "We review the grant of a motion for summary judgment de novo," and "[w]e affirm if we conclude that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Sampay v. Am. Univ.*, 294 A.3d 106, 113 (D.C. 2023) (quoting *Propp v. Counterpart Int'l*, 39 A.3d 856, 871 (D.C. 2012)).

Ms. Andrews's contract argument primarily relates to DCHA's delay in sending her the eight months of pay DCHA owed her upon termination.[4] The trial

---

[4] Ms. Andrews additionally "seeks the lost retirement contributions she would have made during the 60-day notice period" if she had been given the contractually-agreed-upon notice to her termination. The trial court never addressed this argument and the parties dispute its factual basis on appeal. On remand, the trial court should address the matter in the first instance.

court determined that, while DCHA breached Ms. Andrews's employment contract when it terminated her without the contemplated notice, "[b]ecause [Ms. Andrews] has accepted the payment at this point, and because [she] is not entitled to damages for reputational difficulties or time lost in planning for her next position, there are no longer any damages for [Ms. Andrews] to claim."

But the trial court's ruling addressed only part of Ms. Andrew's claim—the alleged reputational harm and time lost in planning for her next position. It did not reach the issue of the economic harm caused by DCHA's delay in paying Ms. Andrews the eight months' severance she was owed.[5] This court has held that "[w]hen a contract fails to specify a time for the performance of an act"—as her contract did here—"the law implies that it must be done within a reasonable time." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 320 (D.C. 2008) (quoting *Indep. Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 869 (D.C. 2005)). "What constitutes a reasonable time for performance depends on the circumstances of each case." *Murray*, 952 A.2d at 320. We remand to allow the trial court to

---

[5] Ms. Andrews argues that, during the period between her termination and her receipt of her severance check, she "had to sell her vehicle . . . , take loans from family and friends totaling $16,000, request mortgage forbearance and student loan deferrals resulting in increased interest payments, and request a financial hardship designation from her daughter's private school resulting in increased educational expenses."

consider the as yet unaddressed economic-harm aspect of Ms. Andrews's contract claim.

IV.

We conclude with Ms. Andrews's negligent supervision claim. She argues that DCHA breached its common-law duty of care when it negligently retained Mr. Garrett despite knowledge that he retaliated against staff.[6] "[A] common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law." *Griffin*, 925 A.2d at 576. In other words, to succeed on a negligent supervision claim against DCHA, Ms. Andrews must show that Mr. Garrett violated a common-law duty owed to her. We have applied the common law to employment claims in "very narrow"

---

[6] Ms. Andrews's complaint alleges, albeit vaguely, that DCHA breached its duty of care to "the public or anyone who came into contact with, was issued, or believed themselves to be protected by genuine KN95 masks." To the extent she continues to press this claim, it fails because she does not allege any harm to her personal health or safety proximately caused by the counterfeit masks, *see Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007) ("[A] plaintiff must prove the existence of a duty of care owed by the defendant to him (or to the class of which he is a member), a breach of that duty by the defendant, and damage to the interest of the plaintiff, proximately caused by the breach."), and because she lacks standing to assert a claim based on an injury suffered by others, *see Riverside Hosp. v. D.C. Dep't of Health*, 944 A.2d 1098, 1104–05 (D.C. 2008) (noting the "general prohibition against third-party standing").

circumstances. *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991). More commonly, "where there is 'a specific, statutory cause of action to enforce' a public policy"—such as a whistleblower protection statute—"this court will 'defer to the legislature's prerogatives and . . . decline to recognize a novel, competing cause of action for wrongful discharge at common law.'" *Robertson v. District of Columbia*, 269 A.3d 1022, 1033-34 (D.C. 2022) (quoting *Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009)); *see also Jones v. D.C. Water & Sewer Auth.*, 943 F.Supp.2d 90, 96 (D.D.C. 2013) (declining to recognize a tort claim for violations of the District's Whistleblower Protection Act)).

Because statutory whistleblower protections already exist, and because Ms. Andrews does not direct us to any common-law duty to protect whistleblowers (nor can we find one), we affirm the trial court's determination that her negligent supervision claim fails because it does not "invoke one of the common law duties" DCHA or Mr. Garrett owed to Ms. Andrews.

V.

For the foregoing reasons, we reverse the trial court's denial of Ms. Andrews's motion to amend her complaint and the court's grant of DCHA's motion for summary judgment on her contract claims. In that regard, we remand to allow Ms. Andrews to amend her complaint and for further proceedings consistent

with this opinion. *See, e.g.*, *Taylor*, 957 A.2d at 55; *Crowley*, 691 A.2d at 1175. We affirm the court's grant of summary judgment on Ms. Andrews's negligent supervision claim.

*So ordered.*